### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**GAYNELL MARTIN**                                 **CIVIL ACTION**

**VERSUS**                                               **NO. 14-2061-ILRL-SS**

**CAROLYN W. COLVIN, ACTING**
**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

The plaintiff, Gaynell Martin ("Martin"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423.

## PROCEDURAL HISTORY

On April 9, 2012, Martin submitted an application for benefits reporting that she became disabled on September 12, 2011. R. 135-36. She reported that she suffered from high blood pressure and depression. R. 159. On June 27, 2012, her application for benefits was denied. R. 86-89. On May 24, 2013, there was a hearing before an Administrative Law Judge ("ALJ"). R. 35-66. On July 17, 2013, the ALJ issued an unfavorable decision. R. 19-30. On August 6, 2014, the Appeals Council denied the request for review. R. 1-4.

On September 9, 2014, Martin filed a complaint in federal court for review of the Commissioner's decision. Rec. doc. 1. The Commissioner filed an answer and the administrative record. Rec. docs. 10 and 11. The parties filed cross-motions for summary judgment. Rec. docs. 15 and 17. Martin was represented by counsel in the hearing before the ALJ. R. 35. She appears in federal court without the assistance of counsel.

## STATEMENT OF ISSUES ON APPEAL

Issue.   Is there substantial evidence in the record to support the final decision of the Commissioner as trier of fact and did the Commissioner apply the appropriate legal standards in evaluating the evidence?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1.  Martin met the insured status requirements of the Act through December 31, 2015.

2.  Martin has not engaged in substantial gainful activity since September 12, 2011, the alleged onset date (20 C.F.R. § 404.1571 et seq.).

3.  Martin has the following severe impairments:  exogenous obesity, essential hypertension and major depressive disorder (20 C.F.R. §§ 404.1520(c), and Stone v Heckler, 752 F.2d 1099 (5th Cir. 1985)).

4.  Martin does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.  Martin has the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. 404.1567(c) except that she must avoid concentrated exposure to temperature extremes and is unable to understand, remember and carry out detailed instructions.

6.  Martin is capable of performing past relevant work as a certified nursing assistant.  This work does not require the performance of work-related activities precluded by Martin's RFC (20 C.F.R. § 404.1565).

7.  Martin has not been under a disability, as defined by the Act, from September 12, 2011, through the date of this decision (20 C.F.R. § 404.1520(f)).

R. 19-30.

## ANALYSIS

a.    **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is

substantial evidence in the record to support the final decision of the Commissioner as trier of

fact and whether the Commissioner applied the appropriate legal standards in evaluating the

evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to

3

404.1599 & appendices, §§ 416.901 to 416.998 (1997).   The regulations include a five-step

evaluation process for determining whether an impairment prevents a person from engaging in

any substantial gainful activity.   Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461;

Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984

(1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant

is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

   The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she

successfully carries this burden, the burden shifts to the Commissioner to show that other

substantial gainful employment is available in the national economy, which the claimant is

capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th

Cir. 1989).   When the Commissioner shows that the claimant is capable of engaging in

alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.;

accord Selders, 914 F.2d at 618.   "In determining whether substantial evidence of disability

---

[1]  The five-step analysis requires consideration of the following:
   First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).
   Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).
   Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).
   Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).
   Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  Perez v. Barnhart, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.    **Testimony at Hearing.**

Martin completed the seventh grade, with a combination of special and regular education. R. 44.  Her last job was in a nursing home. R. 44.  She was a Certified Nursing Assistant ("CNA"), central supply clerk and walker.  R. 44.  Martin took residents of the nursing home out. R. 44.  She last worked there in September 2011.  R. 44.  Her certification as a CNA had lapsed. R. 45.

If Martin could not leave her work on time, she became panicky.  R. 61.  She asked to leave work early whenever she had a panic attack, her blood pressure was high, she had a headache, her chest was hurting, or "whatever." R. 62.  Over a two year period, Martin asked her supervisors if she could leave work early because of her health two to four times a month.  R. 62 and 64.

Martin was left handed.  R. 48.  She could carry 20 pounds.  R. 49.  If she walked, she experienced shortness of breath, and her knees and legs began hurting.  R. 49.  She could only walk about a block before having these problems.  R. 49 and 53.  She had trouble with steps and stairs because her knees gave out on her.  R. 47.  She had arthritis and joint disease in her knees. R. 47.  She did not use a brace for her knees.  R. 47.  She tried a brace one time, but it caused her foot and leg to swell.  R. 47.

If Martin sat for more than 20 to 30 minutes, her back began hurting.  R. 48.  Sometimes she wore a back brace.  R. 48.  She purchased the brace.  Her doctors did not prescribe it.  R. 48.

Martin had a lot of chest pain.  R. 53.  She reported that an EKG indicated she had an enlarged heart.  R. 53.

Martin was 5'7" tall and weighed 240 pounds.  R. 47.  She lost a couple of pounds after her fiancé died the day before her birthday.  R. 47.  Her doctors told her that her weight may be causing her problems.  She had gained weight over the last three or four years.  Even when she weighed less, her legs, knees and chest hurt.  R. 54.

Shortly before the hearing, Martin had a CT scan.  It revealed that she had had a stroke. R. 58.  She had the CT scan because she experienced dizziness walking.  She felt like the room was crooked.  When she was sitting, it seemed the room was spinning.  R. 59.  She experienced this dizziness or vertigo about once or twice a week. R. 59.

Martin had trouble with her memory.  R. 59.  Her concentration was pretty good.  R. 61. At the hearing her neck was stiff.  R. 45.

Sometimes Martin had hallucinations.  R. 51.  She was always hearing things as she lived alone.  Since her friend died, she heard voices after dark.  R. 51.  Sometimes the voices told her to do crazy things and destroy things.  R. 52.  Over six months prior to the hearing, she may have heard such voices twice.  It was the voice of her friend that died.  R. 52.

At the hearing, she properly identified the president.  Her answers for the vice president and governor were wrong.  R. 52.

Martin testified that she had not smoked cigarettes in the past three or four years.  R. 52. She stopped smoking about 12 years before the hearing.  R. 53.  She smoked a cigar for Mardi Gras, but she did not smoke cigarettes.  R. 53.

6

In 2011, she saw Dr. Labranche, a general practitioner, with Crescent City Physicians on Lake Forest Boulevard in New Orleans for high blood pressure, depression and other conditions. He was her primary care doctor.  She did not go to Dr. Labranche any longer because she did not have insurance.  She last saw Dr. Labranche in December 2011.  R. 39-41.

Martin reported that she became disabled on September 12, 2011.  R. 135-36.  On that date, Dr. Labranche put her on a medical leave of absence.  R. 39 and 41.

Martin began going to Daughters of Charity in 2011 or 2012.  R. 41 and 43.  She saw a "physical" doctor at Daughters of Charity every three months.  R. 43.  She saw a regular doctor and a therapist, Jessica, at Daughters of Charity.  R. 43-44.  The record at Daughters of Charity was signed by Chukwunomnso Dennar, M.D.  R. 42.

Daughters of Charity referred her to the Pontchartrain Mental Health Clinic.  R. 41. Every three months Martin saw a psychiatrist, Minati Biswas, M.D., at Pontchartrain Mental Health Clinic.  R. 42 and 43.

In the 12 months before the hearing, she went to the hospital when her knee with degenerative joint disease locked up and when she had an A-fib heartbeat.  R. 51.  She went to the hospital for the knee problem in 2012.  R. 51.  The A-fib heartbeat problem was in March of 2103.  R. 51.

Martin picked up medication every month.  R. 42  Seroquel, Lexapro, Vistaril, high blood pressure medicine and cholesterol control were prescribed for her.  R. 50.  She took prescribed medications daily.  R. 50, 54 and 55.  The medical records indicated she did not.  R. 54.  She responded that she just started taking them regularly.  R. 54.

At the time of the hearing she was taking her blood pressure medication as directed.  R. 55.  There was a time when she was not in the habit of taking her medication.  She had had

difficulty remembering to take her medicine.  R. 55.  Martin's daughter helped her with her medication.  R. 56.  The therapist, Jessica, suggested she use a pill box.  R. 56.  Martin was going to do that.  R. 56.

Since Chartres Pontchartrain prescribed the medication, she has been taking it as prescribed.  R. 56.  The blood pressure medication prescribed by Daughters of Charity gave her a bad cough.  She asked them to change the medication.  There was problem with a refill.  She called in the one that made her cough.  This led to her not taking the blood pressure medication as prescribed.  R. 57.

Since Hurricane Katrina she had been taking nitroglycerin.  R. 57.  They gave her some in the hospital.  R. 57.  She was given some in a bottle eight years ago.  She did not take it.  R. 58.  At the time of the hearing, she took two Bayer Aspirin a day.  R. 57.

In her application, Martin stated she became disabled on September 12, 2011.  This is the date on which Dr. Labranche put her on a medical leave of absence because she was depressed. R. 39-41.  She told Dr. Labranche she was not getting enough sleep.  R. 40.

Martin lived with her daughter in a one story residence.  R. 45, 47 and 56.  There was no one in the household under the age of 18.  R. 45.  Martin and her daughter did the grocery shopping.  R. 46.  Martin's driver's license was expired.  R. 46.  A Lift Bus brought her to the hearing.  R. 47.  Martin's grandchildren come in to do the household chores.  R. 45.  She did not have access to a computer because it broke down.  R. 48.  She had a cell phone.  R. 48.  It was not a smart phone.  She could only make calls on it.  R. 48.

Martin spent time in a flower garden.  It had a rose bush, a cactus plant and a palm.  R. 50.  She watered the plants in her garden, when she saw her neighbor watering his plants.  R. 59. The last time she worked in the garden was in April, the month before the hearing.  R. 60.  In the

six months preceding the hearing, she worked in the garden four or five times.  R. 60.  Each time she worked for about two hours.  R 60.

Martin had a little dog which she fed sometimes.  R. 47.  When she saw the dog's bowls were empty, she put food and water in them.  R. 48.

Martin did not like to talk to people.  R. 61.  She did not socialize.  R. 50.  She did not visit people and people did not visit her.  R. 50.

Martin could put the clothes in the machine to wash them.  R. 46.  She could bathe, clothe and feed herself.  R. 46.  She could warm-up pre-cooked meals, like TV dinners.  R. 46.  She could make a sandwich or a salad.  R. 46.  She could fry eggs on a stove.  R. 46.  She could not make red beans or jambalaya because they took too long to cook.  R. 46.

Martin read sometimes.  R. 49.  She watched television.  R. 49.  On a typical day, Martin hated to get up.  R. 49.  After she got up, she laid around the house.  R. 49.

In response to the ALJ's hypothetical, the vocational expert testified that Martin could return to her past relevant work as a CNA.  R.  62-63.  With the hypothetical posed by Martin's attorney, the expert testified that she could not return to her past relevant work.  R. 63.  With exertional limitations added, including the need to leave work four or five times a month, she could not sustain employment.  R. 64.

c.     **Medical Evidence**.

## 2002-2011

On June 11, 2002, there were MRIs of the brain and face.  There was a narrowing of the right internal carotid artery suspicious for stenosis.  R. 322.  There was a slightly heterogeneous mass in the lining of the left cheek.  R. 323.

On February 22, 2004, there was no evidence of acute cardiopulmonary disease on a chest x-ray.  R. 321.  On March 12, 2004, there was a negative EKG following complaints of chest pain.  R. 314.  On March 19, 2004, there was an x-ray of the right knee for complaints of pain in the knee.  The impression was degenerative joint disease and joint effusion.  R. 320.

On February 18, 2009, chest x-rays were taken at Tulane Hospital.  R. 287-88.

On January 13, 2010, Martin was seen by Emile J. LaBranche, M.D., at Crescent City Physicians on Lake Forest Boulevard for her annual check-up.  She reported pain in her legs with exertion, back pain, chest pain, indigestion, headaches, dizziness, numbness and depression.  She had trouble sleeping and concentrating at work.  R. 402-403.

On September 20, 2011, Martin was seen at Crescent City Physicians.  She complained of headaches and chest pain.  She took over the counter medication.  Nothing helped.  She was under a lot of stress with personal issues.  She wanted a colonoscopy to check for colon cancer.  She had an EKG and laboratory work done with Dr. Bouchette.  She reported job stress.  She needed time off and medical leave.  Her sister in Houston may need hospice.  R. 401.

On November 10, 2011, Martin was seen by Chukwunomnso Dennar, M.D., at Daughters of Charity ("DOC") as a new patient.  She did not take her medicine regularly.  The assessment was heartburn (combined systolic and diastolic elevation was observed), pre-diabetes, and depression.  Tests were ordered.  R. 237-239.

**2012**

On January 19, 2012, Martin was seen by Dr. Dennar.  She smoked cigarettes.  R. 236.  She described headaches that felt like her brain froze.   The assessment was essential hypertension and depression.  R. 236-37.  On February 3, 2012, DOC sent a letter to Martin to schedule an eye exam.  R. 236.

On March 1, 2012, Martin was seen by Dr. Dennar for a follow-up on hypertension.  Her headaches had decreased.  Her chronic conditions were hypertension, depression and heartburn.  She had no specific complaints.   Lisinopril, Amlodipine, Citalopram, and Ranitidine were prescribed.  She was a smoker.  She experienced sensory disturbances and numbness for a couple of days after helping her daughter hammer nails.  R. 234.  The assessment was depression, pre-diabetes and essential hypertension.  R. 235.

On April 11, 2012, Martin was referred by Dr. Dennar for psychiatric services.  R. 273 and 309.

On June 4, 2012, Martin was seen by Dr. Dennar to follow-up on lab results.  She was a current smoker.  R. 267.  The assessment was chest pain, essential hypertension, pre-diabetes, bereavement without complications, and benign neoplasm of the lip.  R. 268.

On June 19, 2012, there was a psychological report by Lester Culver, Ph.D., a consultative examiner.  249-254.  Martin was diagnosed with a mixed personality disorder and severe depression.  Intellectual functioning was dull normal.  She would have difficulty getting along with others at a job over long periods.  She would not be able to deal with the stress common on most jobs. R. 253.  The GAF was 40.  R. 254.

On July 16, 2012, Martin was seen by Dr. Dennar for the test results from her prior visit.  The assessment was chest pain, essential hypertension, pre-diabetes, depression, and benign neoplasm of the lip.  R. 266-267.

On July 23, 2012, Martin went to Tulane Hospital emergency room for knee pain.  There was a limited range of motion.  R. 283-84.  The diagnosis was degenerative joint disease.  Medication was prescribed.  R. 285-86.

11

On July 25, 2012, Martin was seen at the Medical Center of Louisiana-New Orleans ("Medical Center") for a lesion on her lip.  There was a skin colored tumor on the upper lip and the lining of the left cheek.  It was likely benign.  R. 312.

On July 27, 2012, she was seen by Sherridell Lewis, a licensed clinical social worker at Chartres Pontchartrain Mental Health Center ("Chartres Pontchartrain"), for an independent behavioral assessment.  R. 377-81.  The diagnosis was major depression recurrent and severe with psychotic features.  The GAF was 55.  R. 380.

On August 27, 2012, she was seen by Minati Biswas, M.D., a psychiatrist at Chartres Pontchartrain.  The severity of the symptoms was moderate.  There was no change in her global improvement.  She was to return in four weeks.  R. 383-84.

On October 16, 2012, Martin was seen by Dr. Dennar because of knee pain.  Her left knee locked in September 2012.  She went to Tulane Hospital ER for steroid shot.  There was no locking since.  R. 297.  The physical exam for the knees and hips showed no abnormalities.  There were lesions on her lower lip.  R. 298-99.  The pain was localized to one or more joints.  There was chest pain.  X-rays of the knee were ordered.  She was to return in three months.  R. 300.  October 16 x-rays revealed medial compartment osteoarthritis and calcification in the joint space.  R. 308.  On October 17, 2012, Martin went to DOC for prescription refills.  R. 296-97.

On October 29, 2012, Martin went to the Medical Center for intermittent locking of the left knee.  An x-ray showed osteoarthritis.  R. 319.

On November 1, 2012, Martin was seen by Dr. Dennar with a report of calcification in joint fluid by x-ray.  She was referred to an orthopedist.  R. 296.  On November 5, 2012, Martin returned to Dr. Dennar for follow-up on x-ray results for an evaluation of the knee with pain.  She had stopped smoking for five days.  R. 294.  She was a current smoker.  R. 295.  A visit with

12

the psychiatrist was set for December.   R. 294.   The assessment was chest pain, essential hypertension and hyperlipidemia. R. 295-96.

On December 12, 2012, Martin was seen by Pamela Jones, M.D, at the New Orleans East Behavioral Health Center ("NOEBHC") for a follow-up for bipolar disorder.   She felt depressed because she was unable to get a job.   She heard voices sometimes.   Her medications were changed.   She was to return in 12 weeks.  R. 419-20.

**2013**

On January 7, 2013, Martin was seen by Dr. Dennar for prescription refills, muscle spasms in the lower back, left arm pain and numbness.  R. 293.  The assessment was essential hypertension, backache and cubital tunnel syndrome of the left arm.  R. 294.   On January 22, 2013, she returned to Dr. Dennar to check her blood pressure.  R. 292.

On February 4, 2013, Martin was seen by Dr. Dennar for migraines.   She reported chronic headaches.   The diagnoses were hypertension, hyperlipidemia, obesity and depression. Her personal history said she never smoked.  R. 290-292.

On February 19, 2013, Martin was seen at the emergency room at the Interim LSU Public Hospital with complaints of chest pain.   The final diagnoses were chest pain (unspecified), essential hypertension (unspecified), and tobacco use disorder.   She was discharged in good condition that same date.   R. 338-57.   The impression from an x-ray was no acute cardiopulmonary process. R. 317.

On March 6, 2013, Martin was seen by Dr. Dennar with complaints of dizziness.  She was noted as a current smoker.   The assessment was paroxysmal atrial fibrillation.   A CT scan of the head was ordered.  R. 290 and 391.

On March 13, 2013, Martin was seen by Katherine Smith, M.D., at NOEBHC.  She reported that she was not doing well.  She was to return in 12 weeks.  R. 421-23.

On March 20, 2013, Martin went to the Interim LSU Public Hospital with complaints of dizziness, giddiness and walking to one side.  R. 371-73.  A CT brain scan revealed possible focal areas of ischemia of uncertain duration.  R. 316.

On May 6, 2013, Martin was seen by Joanne Dubinsky, an examiner, at DOC.  Martin was seeing a psychiatrist at Pontchartrain Center.  Her fiancé died in Texas in March.  She did not get to go to the funeral.  Her right knee pain was chronic.  A CT ordered by Dr. Dennar was reviewed.  R. 389.  She was a current every day smoker.  R. 390  The assessment was paroxysmal atrial fibrillation and hyperlipidemia.  R. 391.

On May 17, 2013, Martin was seen by Casey Williams, M.D., at DOC for follow-up with test results.  She reported upset stomach; concern over the recent death of her significant other; and an episode of dizziness and falling.  Tests were ordered.  She was a current every day smoker.  R. 386.  The assessment was paroxysmal atrial fibrillation and benign neoplasm of the lip.  R. 388.

On July 12, 2013, Martin returned to NOEBHC and was seen by Jessica Clark, M.D.  She was to return in 12 weeks.  R. 424-26.

On August 14, 2013, Lorraine McCaskill, a licensed clinical social worker at NOEBHC, completed an independent behavioral assessment.  R. 410-14.

d.     **Plaintiff's Appeal**.

**Issue**. Is there substantial evidence in the record to support the final decision of the Commissioner as trier of fact and did the Commissioner apply the appropriate legal standards in evaluating the evidence?

Martin filed a two page handwritten statement of her objections to the ALJ's decision. She contended it was not fair because: (1) the ALJ ignored her doctor's assessment that she was a threat to herself and others; and (2) her medication kept her from functioning. She indicated that her mind goes blank, and she was not in her right frame of mind. Rec. doc. 15.

The ALJ found that the severity of Martin's mental impairment did not meet or medically equal the criteria of Listing 12.04. R. 22. The objective medical evidence did not support her contentions to the degree that her medically determinably impairments were disabling. R. 24. While it was reasonable to expect that Martin would have some limitations in daily activities because of her impairments and intermittent resulting pain, no doctor advised her not to work. Instead, she was advised to diet and exercise. R. 27. The ALJ noted that Martin's employer let her go because she abandoned her position and not because she was unable to perform her job duties. R. 27. Activities performed by her, for example walking, were not consistent with her allegations of incapacitating pain and limitations. R. 28. The ALJ found that Martin's allegations and subjective symptoms were not fully credible. R. 28. Great weight was assigned to the State agency's opinion as it related to limitations secondary to physical impairments because it was supported by the totality of the record. R. 29. However, to the extent that the opinions of the consultative psychologist, Dr. Culver, and the State agency medical consultant concerning Martin's mental impairments were inconsistent with the totality of the record, the ALJ accorded them little weight. R. 29.

The Commissioner argues that substantial evidence supports the ALJ's RFC assessment. The Commissioner contends that the medical evidence demonstrates that Martin often failed to take medication regularly or abide by her diet.  (Rec. doc. 17 (Memorandum at 4).  Multiple physical examinations revealed essentially normal findings except for obesity.  Id.  The Commissioner urges that a claimant's subjective complaints must be corroborated, at least in part, by objective evidence.  Id. at 5.  Objective test results also supported the ALJ's finding of no disability.  Id.  Dr. Clark's three mental health evaluations and the medical evidence of record did not support Martin's alleged disabling mental impairments.  Id. 5-6.  The Commissioner concluded that the ALJ properly interpreted the medical evidence to determine Martin's capacity to work.  Id. at 6.

On November 10, 2011, Martin was seen by Dr. Dennar.  The notes for the encounter reflect that she did not take medicine regularly.  R. 237.  The same notation appears for her visit to Dr. Dennar on June 4, 2012.  R. 267.  She returned to Dr. Dennar on July 16 for the results of tests.  It was noted that she had some citalopram but was not taking it.  R. 266.  At the hearing, Martin contradicted the medical records and testified that she took prescribed medication daily.  R. 50, 54 and 55.  The Commissioner notes if a claimant does "not follow the prescribed treatment without a good reason, . . . [(you)] will not be found disabled. . . ."  20 C.F.R. Part § 404.1530(a), and Johnson v. Sullivan, 894 F.2d 683, 685 n.4 (5th Cir. 1990).

At the hearing, Martin testified that if she walked for about a block, she experienced shortness of breath and her knees and legs hurt.  She reported trouble with steps because her knees gave out.  R. 47, 49 and 53.

On November 20, 2011, Martin was seen by Dr. Dennar.  The physical exam did not reveal any localized joint swelling or joint stiffness.  The motor exam demonstrated no

dysfunction.  R. 237-239.  On January 19, 2012, she returned to Dr. Dennar.  Again, the motor

exam demonstrated no dysfunction.  R. 236-237.  On March 1, 2012, Dr. Dennar found that her

musculoskeletal system was normal.  R. 234.  On June 4, 2012, the musculoskeletal and motor

exams were normal.  R. 267-268.  On July 16, 2012, Martin returned to Dr. Dennar for test

results.  There were no reports of knee pain.  R. 266-267.

On July 23, 2012, Martin went to the emergency room at the Tulane Medical Center for

joint pain in her knees.  R. 283.  A limited range of motion was noted.  R. 284.  The impression

was arthritis inflammatory.  R. 284.  On October 16, 2012, Martin was seen by Dr. Dennar for

knee pain.  R. 297.  He reported that the hips and knees showed no abnormalities.  The motor

exam demonstrated no dysfunction.  R. 298.  On October 29, 2012, there were x-rays of the left

knee for intermittently locking.  There was no acute fracture or dislocation.  There was mild to

moderate osteoarthrosis and faintly perceptible calcification.  R. 319.  The musculoskeletal

examination on February 19, 2013 at Interim LSU Public Hospital revealed normal range of

motion and no edema or tenderness.  R. 340.  The medical records support the Commissioner's

contention that many of the physical examinations revealed essentially normal findings.

Martin's opposition refers to Dr. Jessica Clark, who was one of three doctors seen by

Martin at the New Orleans East Behavioral Health Center ("NOEBHC").  Martin contends that

the ALJ ignored her doctor's finding that she was a threat to herself.  Rec. doc. 15.

The NOEBHC records were not before the ALJ at the time of the hearing.  The last

exhibit number for the exhibits admitted at the hearing was C18E (Crescent City Physicians).  R.

34 and 400-406.  The ALJ's decision was issued on July 17, 2013.  R. 30.  A month later, on

August 16, 2013, counsel for Martin requested that NOEBHC submit its medical records

concerning Martin.  R. 407.  On September 17, 2013, Martin's counsel submitted a letter

memorandum to the Appeals Council in support of her request for review of the ALJ's decision. R. 228-232.   The letter refers to the NOEBHC records.   R. 230.   The Appeals Council acknowledged receipt of the records and identified them as Exhibit C19F.  R. 4.

On December 12, 2012, Martin was seen by Pamela Jones, M.D., at NOEBHC for 14 minutes for a follow-up for bipolar disorder.  R. 419-420.  She had a felony conviction from when she was 19 that prevented her from getting a job.  She felt depressed.  She heard voices sometimes.  She attended church.  The severity of her symptoms was described as moderate. She was to return in 12 weeks.  The Seroquel dosage was increased.  She was to continue on Lexapro and Vistaril.  The GAF score was 55.  R. 420.  Although it is described as a follow-up visit, the record does not contain any evidence of visits to NOEBHC prior to December 12, 2012. On the mental status exam, Dr. Jones recorded that there was no risk of harm to herself and no thoughts of harm to others.  There was low risk of harm.  R. 419.

On March 13, 2013, Martin was seen by Katherine Smith, M.D., at NOEBHC for 16 minutes.  R. 421-423.  She reported that she was not doing well.  She was looking for work and frustrated that she was unemployed.  She was to return in 12 weeks.  Her GAF was 55.  R. 423. Dr. Smith indicated that Martin had no thoughts of harm to others and there was no risk of harm to herself.  R. 422.

On July 12, 2013, Martin returned to NOEBHC and was seen by Jessica Clark, M.D., for 30 minutes.  R. 424-426.  Her history included bipolar disorder.  She reported many problems contributing to her depression:  death of her fiancé in March 2013; unemployed; financial strain; foreclosure of her house and car; and death of a close friend.  Her last hospitalization for her psychiatric condition was in the 1990's.  Her last manic episode that also had mild psychosis was in September 2011.  She had been on Lexapro for many years.  She was to return in 12 weeks.

18

The GAF was 55.  R. 426.  Dr. Clark indicated that Martin had no thoughts of harm to others and there was no risk of harm to herself.  R. 425.

Contrary to Martin's assertion, neither Dr. Clark nor the other two doctors who examined her at NOEBHC, found that she was threat to herself or others.

The visits to NOEBHC on December 12, 2012, March 13, 2013 and July 12, 2013 reflect evidence submitted to the Appeals Council for the first time.  Because the medical records were considered by the Appeals Council, they must be considered by the district court.  Higginbotham v. Barnhart, 405 F.3d 332, 337-38 (5th Cir. 2005).  These medical records relate to the period prior to the ALJ's decision.  "[I]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470(b).

On August 14, 2013, Lorraine McCaskill, a licensed clinical social worker at NOEBHC, completed an independent behavioral assessment.  R. 410-414.  Martin's chief complaint was depression.   The reported symptoms included auditory and visual hallucination, marked paranoia, stressed out at times and racing thoughts.  Her medical conditions included high blood pressure, a stroke on March 20, 2013, diabetes, heart disease and degenerative joint disease.  R. 411.  She was diagnosed with major depressive disorder, recurrent, and severe with psychotic features.  The GAF was 55  R. 414.  Ms. McCaskill indicated that Martin was a moderate risk of harm to herself or others.  R. 414.

Ms. McCaskill's assessment that Martin posed a moderate risk of harm to herself or others was made on August 21, 2013 (R. 410) or about a month after the ALJ issued his decision on July 17, 2013 (R. 30).  This assessment is not material because it does not relate to the time period for which benefits were denied and it was made by a social worker on a questionnaire

form.  There is no reasonable possibility that it would have changed the outcome of the ALJ's decision.  Bradley v. Bowen, 809 F.2d 1051, 1057-58 (5th Cir. 1987).

While Martin indicated that she could not focus (R. 173) and her sister reported that she could not be relied on and needed supervision (R. 192), her sister reported that she took care of her hygiene, cooked, cleaned, did laundry and fed herself (R. 193-194).  When she went out, she walked, drove a car or rode in a car (R. 195).  She shopped in stores (R. 195).  The ALJ and the Commissioner noted that the record of Martin's daily activities did not support her claim of disabling mental conditions.

In her objection to the ALJ's decision, Martin reported she was homeless, she could not get a job, and she had lost her best friend.  Rec. doc. 15.  While these are daunting circumstances, unemployment for reasons other than disability will not support a claim for disability benefits.  Harrell v. Bowen, 862 F.2d 471, 479 (5th Cir. 1988).

The function of this Court is limited.  Perez, 415 F.3d at 461.  If there is substantial evidence for the Administrative Law Judge's decision and if the appropriate legal standards were employed, the decision must be upheld.  Substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey, 230 F.3d at 135.  This court may not re-weigh the evidence, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.  The test is not whether the decision of the Administrative Law Judge was fair.  There is substantial evidence in the record to support the final decision and the appropriate legal standards were applied.

## RECOMMENDATION

IT IS RECOMMENDED that:  (1) the Commissioner's cross-motion for summary judgment (Rec. doc. 17) be GRANTED; and (2) Martin's motion for summary judgment (Rec. doc. 15) be DENIED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 13th day of July, 2015.

**SALLY SHUSHAN**
**United States Magistrate Judge**